UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| A D B COMMERCIAL CONSTRUCTION (LOUISIANA) L L C | CASE NO. 2:22-CV-01083 |
| VERSUS | JUDGE JAMES D. CAIN, JR. |
| ST CHARLES HOUSING L P | MAGISTRATE JUDGE KAY |

## MEMORANDUM RULING

Before the court is a breach of contract suit filed by ADB Commercial Construction (Louisiana) LLC against St. Charles Housing LP, with counterclaim by St. Charles. Docs. 1, 6. The matter came before the court for a one-day bench trial on October 10, 2023. The undersigned now issues this ruling.

### I.
### BACKGROUND

This suit arises from repair work done by ADB at St. Charles Place Apartments in Lake Charles, Louisiana, following Hurricane Laura. St. Charles Housing LP retained ADB to perform repair work on the 148-unit complex and restore it to as-was condition. The parties agreed to compensation on a cost plus ten percent basis. Work commenced in the fall of 2021. There was no comprehensive scope of work and the project was instead staged incrementally. Work was also complicated by the absence of previous plans for the complex, the amount of storm damage, additional damage from termites and a freeze in

spring of 2021, permitting issues, and the owner's decision to move water heaters and convert from gas to electric.

St. Charles employee Jennifer Duenas initially served as project manager, working with ADB construction manager Ray Clark. Invoices were submitted by ADB on the first and fifteenth of every month and generally paid in short order. In January 2022 Ms. Duenas hired Jasmin Tran to serve as an on-site assistant. At Ms. Duenas's request, Ms. Tran began auditing ADB's invoices and identified some discrepancies on wood counts. Ms. Tran also communicated directly with managers at Apartment Corp (corporate parent of St. Charles), accusing ADB of overbilling and indicating that she could renegotiate pricing. A meeting took place on March 24, 2022, between Ms. Duenas, Ms. Tran, and representatives from Apartment Corp. There Ms. Tran laid out her findings and Apartment Corp decided to terminate ADB from the project, after which Ms. Duenas resigned.

ADB filed suit in this court on April 25, 2022, alleging that it was owed $696,640.96 in outstanding invoices for work performed up to the time of termination. Doc. 1. Accordingly, it raised claims for breach of contract or, in the alternative, equitable estoppel, detrimental reliance, unjust enrichment, and/or quantum meruit under Louisiana law. *Id.* It also made a claim for attorney fees under Louisiana's open account statute, La. R.S. 9:2781. St. Charles then countersued for breach of contract, negligence, and fraud. Doc. 6. It alleged that ADB had overcharged for its work and that the work was substandard and incomplete, necessitating significant rework by St. Charles after ADB's termination. *Id.*

The matter came before the undersigned for a one-day bench trial on October 10, 2023. The court received the trial deposition of Jennifer Duenas and heard live testimony

from Ray Clark, Jasmin Tran, and David Olson, who succeeded Ms. Duenas at Apartment Corp. The court also received substantial documentary evidence from the parties. Upon consideration of the evidence and testimony, the undersigned now issues this ruling.

## II.
### FINDINGS OF FACT & CONCLUSIONS OF LAW

A. **Evidence Adduced at Trial**

1. **Ray Clark**

Mr. Clark testified that he is a construction manager for ADB with over 50 years of experience in the industry. Tr., p. 3. He has handled over 200 jobs as a project manager and has worked for ADB for 11 years. *Id.* at 4. He acted as ADB's project manager for the St. Charles Place Apartments project in 2021 and 2022, first meeting with Jennifer Duenas on site to submit a bid. *Id.* at 4–5. He described the condition of the complex as "in a lot of disarray," with buildings partially demolished and major freeze damage to exposed plumbing after the demolition. *Id.* at 6.

The initial scope offered by St. Charles was for roof replacement. *Id.* at 7. This work was complicated by uncertainty on replacement of the "doghouses," decorative units off the main façade, which had sustained substantial storm damage. *Id.* Otherwise, pricing requests came incrementally as St. Charles made decisions about what it would repair and how it would allocate insurance funds. *Id.* at 8–9. Efforts to define the scope of work were also limited by the fact that St. Charles did not have original structural drawings for the complex. *Id.* at 8.

The roof was replaced and paid for on a lump sum basis but all other work was done on a unit price basis, with ten percent markup. *Id.* at 11; *see, e.g.*, doc. 23, atts. 1 & 2 (electrical and plumbing quotes). Pricing was determined by the board foot of lumber, inclusive of labor, material, and additional demolition. Tr., p. 18. Accuracy of the quotes was complicated by the need for code upgrades on some aspects of the project as well as the inability to uncover all preexisting termite damage across the sixteen buildings of the complex. *Id.* at 15–16, 18. Additionally, St. Charles decided to convert the units from gas to electric and to change water heater locations. *Id.* at 19. Mr. Clark also maintained that St. Charles never made a final decision as to other aspects of the project, such as finishes, doors, mold testing, and removal of existing sheetrock in apartments that had not already been gutted. *Id.*

Nevertheless, Mr. Clark testified, ADB proceeded efficiently with its work and generally obtained prompt authorization and payment from St. Charles through Jennifer Duenas. *Id.* at 19–21. At the same time, ADB understood that it was only committed to finish the work that was authorized. *Id.* at 22. Invoices were submitted twice a month, on the first and fifteenth, and ADB only billed for completed work. *Id.* at 21. It received payment within two to three weeks until the last two months or so of the project. *Id.* at 22.

The slowdown in payment coincided with the arrival of Jasmin Tran in December 2021. Ms. Tran was hired to assist Ms. Duenas on the project and met with Mr. Clark every day. *Id.* at 24. Mr. Clark described their relationship as "good until she tried to take the project over." *Id.* Mr. Clark stated that Ms. Tran had attempted to renegotiate pricing with him but that he had refused. He also referenced an email written by Ms. Tran to Ms. Duenas

and Apartment Corp managers in February 2022. The email began as a response to Ms. Duenas's question about which units at the complex were to be designated as ADA-compliant. Doc. 23, att. 4. After providing this information, Ms. Tran stated:

> As Jennifer knows, I have carried out a personal physical inspection on all 121 units, the laundry and the leasing offices. I have emailed 121 individual surveys to Jennifer.
> During this survey I noted and am making my notes available to anyone who would like to see them as they are helpful in moving forward with the project and controlling the invoicing received by ADB.
> May I respectfully make the following suggestions:
> We have an in house meeting with regards to my findings. (Zoom is suggested).
> We may be in a position to renegotiate the electrical and plumbing and cleaning contracts: post the air tests carried out last month.
>  Based on my experience of being a licensed contractor in the State of California for 30 years (now retired- but can activate my licence) my knowledge and experience can save in the region of 100k  PLUS on these (quasi) contracts.  A complete rewire (electrical) and a repipe in buildings 7-16 are not necessary. Why? Because the results of the salvage survey indicate this. (Further John Boling walked some of the survey to confirm my findings).
> I walked some of the building with Ray to point out the unnecessary work and encouraged him that his billing should reflect my findings.
> There are significant savings to be made here, now that a thorough survey has been carried out personally and is reliable.
> Jennifer has been prudent in making sure that I check any in coming bids, for gouging (contractors getting a little ambitious [greedy].
> Jennifer has been adamant that I check every past invoice for over billing, which I am sorry to report has been the case on this Lake Charles job. Having said that, I have noted in the files letters from Heinrich Engineering, expressing that they checked ADB's counts. It has been disappointing to Jennifer and I that the counts do not match, I believe Jennifer has a plan on how to address this.
> . . . .
> If you have any further questions I am available and on site Mon-Saturday 7-8pm (when Ray leaves).  The auditing has taken up most of my time.  And by the way, the auditing has been fruitful for us.

Doc. 23, att. 4.

ADB was terminated from the project by phone on March 24, 2022, following the meeting suggested by Ms. Tran. Tr., pp. 26, 32. Before that point, Mr. Clark testified, he had met with Ms. Tran on site to discuss double-billing on a roofing contract and some inaccurate counts for units of lumber. *Id.* at 26. As a result of this meeting and a subsequent review ADB issued credit invoices to St. Charles on April 11, 2022, in the amounts of $8,698.00 for an overpayment on corridor billing, $20,522.00 for the miscount, and $16,322.00 for the roof billing, for a total of $45,542.00. Tr., pp. 27–31; *see* doc. 23, atts. 5–7 (credit invoices). Mr. Clark admitted that he would not have undertaken this audit without Ms. Tran's request. Tr., p. 45. He also admitted that he had no indication St. Charles had approved the amount of the credit. *Id.* at 47.

At the time of termination, Mr. Clark testified, ADB was actively working on the scopes of work it had been authorized to perform. Tr., p. 33. ADB ceased work immediately upon termination and Mr. Clark sent a letter to Todd and Marc Menowitz, principals of Apartment Corp, on April 15, 2022. *Id.* at 33–34; *see* doc. 23, att. 8. The letter outlined several categories of outstanding invoices, totaling $702,197.56 less an adjustment of $45,542.00 as described above, for a total of $656,655.56. Doc. 23, att. 8. Mr. Clark, on behalf of ADB, asserted that St. Charles was in default for this amount and demanded immediate payment. *Id.* He also demanded payment within fifteen days on four additional invoices (Nos. 1187, 1188, 1190, and 1191), totaling $39,985.40, for work requested and performed through the date of termination. *Id.*

Attached to the letter was a Job Summary prepared by Mr. Clark, outlining the status of all invoices submitted on the project. Doc. 23, att. 9. According to this summary, the

total amount billed on the project is $2,427,744.61. *Id.* Given the adjustment amount of $45,542.00 on the credit invoices, Mr. Clark contends, the error rate on billing is less than two percent. *Id.* at 9; Tr., pp. 37–38. Additionally, with no further payments made by St. Charles since that demand, the total amount outstanding is $696,640.96 spread out over 104 invoices. Tr., p. 38. All of the open invoices were introduced into evidence at trial. *Id.* at 39; *see* doc. 23, atts. 10–113.

Of the in-progress work, Mr. Clark testified that ADB was about 70 percent complete with work under Invoices 1190 and 1191 (new lines to pop-off valves in buildings 7-16 and work required by city in all buildings for installation of additional drain pans). Tr., pp. 39–40; doc. 23, atts. 10 & 11. For Invoices 1187 and 1188, which related to plumbing rough-ins on specified units, he testified that the work was about 60 percent done at the time of termination. Tr., p. 41; doc. 23, atts. 12 & 13. He also testified that only about 25 percent of total electrical work on the project was complete at termination and ADB did not invoice for any work it had not completed. Tr., pp. 41–42. He was unaware of any problems with the electrical work at termination and had not been made aware of any since then. *Id.* at 42. Likewise, he testified that plumbing was only 25 to 30 percent complete at termination and ADB had not invoiced for any work it did not do. *Id.* at 42–43. He was unaware of any problems with the plumbing at termination and had not been made aware of any since then. *Id.* at 43.

As for the roofing, Mr. Clark testified that ADB had completed all such work on the project. *Id.* At termination the laundry building roof was having problems with shingles popping out of a mansard. *Id.* This occurred while ADB was repairing additional termite

damage in the building. *Id.* at 43–44. Mr. Clark testified that ADB would have fixed the problem through attrition at no additional charge if it had remained on the project. *Id.* at 44. He denied that the entire roof needed to be replaced. *Id.* at 44. He also maintained that he had not been alerted to any additional deficiencies with the work since termination. *Id.* He admitted, however, that he had not been on site since termination and would have no knowledge of any repair work. *Id.* at 47–48.

   2.  **Jennifer Duenas**

Jennifer Duenas testified via trial deposition. Doc. 23, att. 114. At the time of ADB's termination she worked as director of development and construction for Apartment Corp and had been in that position since February 2021. *Id.* at 73–74. She has 19 years of experience in the field and has served as an expert witness on real estate and construction. *Id.* at 71–72. She hired ADB for the St. Charles Place project, first accepting its bid for roof work after the previous contractor was fired. *Id.* at 74–78. She worked with ADB to define scopes of work and negotiate for each trade. *Id.* at 11–14. She testified that this approach, as opposed to a single lump sum contract, resulted in savings of about $4 million for ownership. *Id.* at 13–14.

Ms. Duenas represented St. Charles in negotiations with ADB but had to seek approval from Apartment Corp ownership before proceeding with major trade items. *Id.* at 18. She dealt primarily with Ray Clark on this project and would receive invoices directly from ADB. *Id.* at 18–19. Before Ms. Tran came on as her assistant, Ms. Duenas would audit ADB's billing by walking the site with Mr. Clark and by cross-checking invoices against each other. *Id.* at 20–21. If she could not be on site at the time, she would have Mr.

Clark send her pictures of the work. *Id.* She would then attach a cover sheet to each invoice documenting her review and the amount to be paid, and submit these to ownership for ultimate approval. *Id.* at 22.

Over the course of the project, until her resignation, Ms. Duenas visited the site seven to ten times for weeklong visits. *Id.* at 80–81. About three months after ADB started, she requested that Apartment Corp hire someone to assist her at the site. *Id.* at 23. She testified that Ms. Tran was intended to be her "boots on the ground," because Ms. Duenas "was running over eight or 12 projects nationwide" and it was "hard to keep up with everything when you're constantly flying around." *Id.* She further testified that Ms. Tran would have authority to negotiate on certain items, if issues came up on site, but that ultimate approval and negotiation authority was to remain with Ms. Duenas. *Id.* at 23–24.

Ms. Duenas offered the job to Ms. Tran, who was the mother of a good friend and was looking for a way back into the construction field after several years away. *Id.* at 63–65. At Ms. Duenas's behest, Ms. Tran began checking past invoices to make sure Ms. Duenas had not missed anything. *Id.* at 87–88. Nevertheless, Ms. Duenas was "extremely . . . in shock" when Ms. Tran sent her February 2022 email raising issues with ADB to Apartment Corp management. *Id.* at 65. She stated that there was no need for Ms. Tran to go over her head to ownership, and that she was left with the impression that Ms. Tran was trying to take her job. *Id.* Ms. Duenas testified:

> And I called her and told her, I said, look, you're making it very clear you want my job. You want it, take it, but you're not ready for it yet. Let's first get you up to speed on the job you're doing because you haven't been doing this since the '80s. Slow your roll, it's only been a month. Relax. Breathe. It's okay. I'll build you up to that point because I don't want to be

> in this seat forever. I had other plans. So let's build you up, let's train you, let's get you used to the way it works.

*Id.* at 66. Ms. Duenas then elaborated on her criticisms of Ms. Tran's issues with ADB, explaining that Ms. Tran's perspective was too limited and that she had unrealistic expectations on pricing. *Id.* at 66–70.

Ms. Duenas, Ms. Tran, and Apartment Corp representatives met for several hours in Miami on March 24, 2022, to discuss the issues raised by Ms. Tran in her February 2022 email. Ms. Duenas defended ADB's work and herself against accusations by Ms. Tran. *Id.* at 46–48. Ms. Duenas vehemently opposed the decision to terminate ADB, noting that ADB had just passed plumbing and electrical inspection at the site and was continuing to save Apartment Corp money:

> On top of it, we went from a $12,000,000 budget that was projected based on the insurance carrier and the bank and the previous bids, we're pacing [$8 million], we'd be shooting ourselves in the foot. That doesn't make any sense. He just passed rough inspections. We're getting ready to start closing up walls. That's it. We're going to start flying now. It did not make any sense. I said, look, at the minimum, let's trade – if you don't want to give them any work, let's finish the work that we have contracted him on because you're saving money and he's performing. I don't understand what the issue is.
> And when they said they were – then they terminated him and they weren't going to pay him, I couldn't stomach that. The guy did his work. He passed inspections. We got it at [] below cost compared to any other bidders that we got. And when I say I beat Ray down on the pricing, I beat Ray down on the pricing.
> . . . .
> And on top of it, we got a better – and, excuse me, when I say we, I'm referring to the property ownership. We got a better end product than we originally sought. We got all new plumbing, all new electrical. We got almost everything reframed. We got all new windows. We got new roofing. We got new mansards. We were going to get new stairs. We ended up with a larger scope. . . .

Page 10 of 16

> So we ended up in a better position than we started with with the prior company. This is why I was so upset that they wanted to terminate. And I tried to ask them, please don't do this, like it does not make any sense.

*Id.* at 46–48. Accordingly, Ms. Duenas resigned a few days after Apartment Corp terminated ADB. *Id.* at 24–27.

Ms. Duenas also disagreed with ownership's decision not to compensate ADB for its work, noting that ADB had self-funded the work to keep the project going "because we promised that the paperwork would catch up" and that she was not aware of any glaring deficiencies in the work up to that point. *Id.* at 27, 70. She admitted, however, that she had not been to the St. Charles site or spoken with Ms. Tran since her resignation. *Id.* at 93–94. Ms. Duenas has worked with ADB in her subsequent positions, contracting with them for disaster restoration work on another apartment complex and then borrowing a superintendent to assist on a job that had fallen behind. *Id.*

### 3. Jasmin Tran

Ms. Tran testified that she officially began working for Apartment Corp/St. Charles on January 4, 2022, though she first visited the site at Ms. Duenas's invitation shortly before Christmas 2021. Tr., pp. 52, 98. Ms. Tran held a California contractor's license from 1985 to 2006 but left the construction industry after a back injury. *Id.* at 97–98. She had been running a business in the United Kingdom but had sold it three years ago and knew Ms. Duenas as a friend of her daughter's. *Id.* Ms. Duenas told Ms. Tran that she was under stress with her job in Lake Charles and Ms. Tran offered to take a look. *Id.* At Ms. Duenas's invitation Ms. Tran began reviewing invoices and walking through the buildings, comparing the counts. *Id.* at 98–99. She noted some discrepancies and raised them with

Ms. Duenas. *Id.* at 98–100. Ms. Duenas called her superiors at Apartment Corp and then offered Ms. Tran a job, asking her to be on site and audit the invoices previously paid to ADB. *Id.* at 100–01.

Ms. Tran acknowledged that she never had approval authority over ADB's invoices, and that final authority instead rested with Ms. Duenas. *Id.* at 53–54. She remained on site in Lake Charles, auditing invoices and walking the property with Mr. Clark and other ADB representatives. *Id.* at 101–03. When the issue of overbilling was first raised, she testified, she had a meeting with Mr. Clark, Ms. Duenas, and ADB owner Guy Barrios at which they agreed that the overbilling was approximately $150,000 to $153,000. *Id.* at 54–55, 102–03. She never signed any documentation approving the overbilling amount as $20,522. *Id.* at 103.

Ms. Tran admitted that the March 2022 meeting was called at her behest and that she was in favor of terminating ADB while Ms. Duenas was not. *Id.* at 102–04. Later, however, she maintained that she did not know anything about the decision to terminate until the time came to inform ADB and she offered her phone. *Id.* at 111. After ADB's termination and Ms. Duenas's resignation, Ms. Tran was promoted to project manager. *Id.* at 105. She testified that it was a "nightmare" completing the project from that point and that she continued to uncover partially or incorrectly completed plumbing and electrical work. *Id.* at 105–06. She elaborated on several such instances, necessitating the hiring of additional subcontractors, and introduced invoices from these subcontractors. *Id.* at 105–10. She admitted, however, that other than some air-conditioning closets ADB had not

closed up walls. *Id.* at 112. According to Ms. Tran, the project was finally completed in April 2023 and the complex is now at 85 percent occupancy. *Id.* at 110.

### 4. David Olson

David Olson succeeded Jennifer Duenas as director of development and construction for Apartment Corp. Tr., p. 58. He has decades of experience in construction and holds a California contractor's license. *Id.* at 68. He started his role with Apartment Corp in July 2022 and never had any interaction with ADB or Ms. Duenas. *Id.* He identified all subcontractor invoices for rough-in, whether defective or incomplete, as remediation for ADB's work. *Id.* at 60. Through Mr. Olson's testimony defendant introduced dozens of post-termination invoices from roofing, plumbing, and electrical contractors with certain amounts designated as repair/rework necessitated by ADB. Mr. Olson never compared these invoices against ADB's invoices, however. *Id.* at 60–61. He also testified that he understood the primary reason for ADB's dismissal was overbilling rather than issues with its work. *Id.* at 70–71. He admitted that he was unaware of how much work was remaining on ADB's contract and change orders. *Id.* at 96.

### B. Law & Application

A federal court sitting in diversity jurisdiction applies the substantive law of the forum state. *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 687 (5th Cir. 1991) (citing *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)). Under Louisiana law every construction contract carries the implication that the work of the builder will be performed "in a good workmanlike manner, free from defects in either material or workmanship." *Salard v. Jim Walter Homes, Inc*, 563 So.2d 1327, 1330 (La. Ct. App. 3d Cir. 1990). A contractor must

also perform in accordance with contract plans and specifications. *O & M Const., Inc. v. State, Div. of Admin.*, 576 So.2d 1030, 1039 (La. Ct. App. 1st Cir. 1991). Where there is substantial performance on a construction contract, the contractor is entitled to recover the contract price reduced by the amount necessary to complete the work and repair any defects. *West v. Collins*, 648 So.2d 500, 501 (La. Ct. App. 4th Cir. 1994); *accord Herlitz Const. Co., Inc. v. Clegg Concrete, Inc.*, 378 So.2d 1002 (La. Ct. App. 1st Cir. 1979) (If remedial work is required to complete a project in accordance with specifications, the cost of this work must be borne by the party at fault). A party seeking to reduce the contract price by an amount to perfect or complete work bears the burden of proving the necessity of such perfection or completion and its cost. *O & M Const., Inc.*, 576 So.2d at 1039.

No expert testimony was introduced on the quality of ADB's work. The court finds little reason to credit the testimony of Ms. Tran. She went over the head of her supervisor after one month on the site to claim ownership of the project despite not having worked in the industry for at least fifteen years. Ms. Tran now attempts to deny all responsibility for ADB's termination, even though it was her email that led to the March 2022 meeting with Apartment Corp managers and her phone that was used to call ADB to fire them from the job at the end of that meeting.

Ms. Duenas, on the other hand, had greater experience in the field and greater familiarity with the project. She disputed any insinuation that ADB was intentionally overbilling and had no reason to believe its work was less than workmanlike. She has also continued to use ADB on other projects. Mr. Clark and Ms. Duenas both testified to complications created by the disarray of the site and the incremental staging of the project,

providing a sound explanation for the overbilling and any other inefficiencies. Finally, the court found Mr. Olson to be sincere and suitably experienced. He was reliant on Ms. Tran's input, however, and did not come to the project until four months after ADB's termination. Additionally, he did not compare the invoices for ADB's completed work with the claimed remediation/rework. He was admittedly unaware of the amount of work remaining on the scopes provided for ADB. Accordingly, any opinion on the quality or completion of ADB's work that can be derived from his testimony is of little persuasive value.

For these reasons, the court finds that St. Charles breached its contract by failing to pay the outstanding invoices. It is not entitled to a reduction for any of the claimed plumbing, carpentry, or electrical rework/remediation. ADB presented credible testimony that its plumbing and electrical work on the project were largely incomplete, with the areas still exposed for further work, and St. Charles fails to adequately differentiate between remediation and completion. There was also insufficient testimony on the completion of any carpentry work. St. Charles is entitled to a credit for roof repairs. There is no dispute that ADB had completed all roofing work on the project and St. Charles presented competent evidence of leaks necessitating repairs. St. Charles has not carried its burden as far as showing that the entire roof will need to be replaced, however. Accordingly,

ADB is owed **$696,640.96** in outstanding invoices for work performed up to the time of termination less the amounts presented in Defense Exhibits 3 through 3.5 [doc. 14, atts. 6–11] from Futrell Roofing[1], in Defense Exhibits 14, 14.1, 14.2, and 14.4 [doc. 14,

---

[1] On the first of these invoices over $48,000 is billed and defendant claimed $6,600 as compensable on a summary submitted to chambers. But the highlighted portion on the second page indicates, and Mr. Olson testified, that only $4,000 was for ADB rework. Tr., p. 77; doc. 24, att. 6, p. 2.

atts. 49, 50, 51, and 53] from Manlyman Handyman[2], and in Defense Exhibit 2.5 [doc. 24, att. 5] from Delta Development for roof repair as well as the amounts billed by JRA Remodelations in Defense Exhibits 6 and 6.7 [doc. 14, atts. 32 & 39] for drywall repair from roof leaks. The total for these repair credits is **$26,762.00**. ADB is thus owed the principal sum of **$669,878.96** plus costs and judicial interest in accordance with the law.

ADB has also proven its demand for the sums presented in the invoices and the accuracy thereof by a preponderance of the evidence. St. Charles is entitled to a credit for less than five percent of the amount demanded due to rework and remediation necessitated by apparent issues with the roofing. It never contested ADB's invoices, however, and has not shown a basis for its refusal to pay on the vast majority of the amount due. ADB is therefore entitled to reasonable attorney fees under La. R.S. 9:2781.

**THUS DONE AND SIGNED** in Chambers on the 19th day of October, 2023.

JAMES D. CAIN, JR.
**UNITED STATES DISTRICT JUDGE**

---

[2] From Invoice 1303, Defense Exhibit 14 [doc. 24, att. 49] the court deducts $700 for plumbing repairs. Invoice 1319, Defense Exhibit 14.5 [doc. 24, att. 54] purportedly contains costs for roof repairs for pipe penetration. The court is unable to connect this to substandard roof work, however, and makes no credit to St. Charles in association with the invoice.